Filed 10/17/25  N.S. v. H.C. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| N.S., <br><br>     Appellant, <br><br> v. <br><br> H.C., <br><br>     Respondent. | D084798 <br><br><br> (Super. Ct. No. 19FL012075E) |

APPEAL from an order of the Superior Court of San Diego County, Terrie E. Roberts, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Holstrom, Block & Parke and Ronald B. Funk; Law Office of Peter H. Gold and Peter H. Gold for Appellant.

No appearance for Respondent.

In this family court matter, N.S (father) appeals a custody and visitation order granting to him and mother, H.C., joint legal and physical custody of their daughter, who was born in 2016 and their son, who was born

in 2018.  Father contends the court erroneously (1) failed to protect his fundamental constitutional right to raise the children in his Sikh faith; (2) admitted hearsay evidence regarding the children's haircut preferences; and (3) denied his request for sole legal and physical custody of the children. We affirm the court's custody and visitation ruling, but reverse its ruling on the children's religious observances, and remand with directions.

FACTUAL AND PROCEDURAL BACKGROUND

*Background Information and Proceedings*

In May 2022, following a trial on custody and visitation, the family court (Judge Birchak) granted father sole physical custody of the children. Except for granting father sole authority to initially determine their school and primary medical providers, it granted the parties joint legal custody. The court granted father's motion to move the children from mother's Washington state residence to father's San Diego residence.  It ruled as to the parents' religious practices:  "Neither parent has demonstrated any detriment to the other parent exposing the children to their religious beliefs. Therefore, each parent may involve the children in their religious practices and beliefs.  Neither parent may prohibit the other from doing so."

In September 2022, following a grant of mother's petition for a temporary restraining order (TRO), the family court awarded mother sole legal and physical custody of the children, and denied father visitation rights.

In October 2022, the family court amended the TRO and ordered joint legal custody, with father having physical custody of the children.

In December 2023, the family court denied both parties' requests for restraining orders and set a trial date for the underlying postjudgment motion to modify child custody and visitation, among other matters.

2

*The Parties' Trial Briefs in the Underlying Proceeding*

Father argued in his trial brief: "[Mother] has shown a complete disregard for [his] raising the children in the tradition of his Sikh faith. Bracelets the children wear as reminders of their faith, as well as the head covering for their son, are discarded by [her] during their time with her, and she insists upon cutting their hair exceedingly short, knowing that a tenet of the Sikh faith is to leave hair uncut. The evidence will show that [mother] refuses to communicate with [father] about amending the [telephone] call schedule such that it will permit him to attend temple on Wednesdays." Father sought sole legal and physical custody under Family Code sections 3011 and 3020,[1] "such that the children primarily reside in [his] home, with visits with the mother every other weekend and one non-overnight visit each midweek."

Mother argued in her trial brief: "[Father] has repeatedly harassed [her] with requests to not cut the children's hair and leave their hair 'uncut' despite the children having haircuts beginning as early as [four] months old; despite the children's preference and standard to have their hair groomed to their liking, hygiene, and social standards. There is no court order prohibiting the children having their hair cut." She recounted that in 2023,

---

[1] Undesignated statutory references are to the Family Code. Section 3011 subdivision (a) lists several factors the court must consider in making a determination of the best interests of the child in a proceeding. Section 3020, subdivision (b) provides: "The Legislature finds and declares that it is the public policy of this state to ensure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except when the contact would not be in the best interests of the child[.]"

father was arrested for domestic violence based on an incident in which he came between their son and her. She claimed father harassed her by going to the children's jiu jitsu gym and video recording the owner while asking him if mother is attending classes and demanding to know what days she is taking the children there. She stated father has filed several civil suits against her in both California and Washington. She asserted she has put "the children's best interests before her own by uprooting her life, her older children's lives, her career, friends and family to move to California to be a present parent for the children that she loves deeply. [She] has taken [two] jobs and works the week the children are in [father's] home in order to be fully present for the time the children are home in her care." Mother requested "sole legal and physical custody with alternating weekends and a weekday visit on opposing weeks."

*Father's Testimony*

Father testified he practices the Sikh faith, whose primary tenets are uncut hair from birth (kesh), as well as use of a bracelet (kara), a small comb (kanga), undergarment (kacha) and a small dagger (kirpan). When their first child was conceived, he and mother discussed raising her in the Sikh faith. The children wear a bracelet "to remind you not to do wrong. To remind you to practice the teachings of your faith and you put it on the hand that you do stuff with. It's sort of a symbolic chain that, hey, you're being watched." The children had no objection to wearing the bracelets. The court admitted into evidence various photos showing the children wearing the bracelets starting from infancy.

Father testified that son started wearing a head covering, called a patka, before he was two years old, and has continued doing so without objections. Girls are not required to wear the patka. The children attend

4

temple and are enrolled in temple classes to learn music. Father testified that to ensure the bracelets did not hurt the children, he wrapped them with athletic tape before they participated in sporting activities.

Father testified he never supported cutting the children's hair, and it was not until mother moved them to Washington that she started that practice. He asked her not to do so, but she responded that the children "want to look like their peers or their family." Father added, "That means she wants them to look White and act White." Mother also claimed uncut hair was "unhygienic or something to that extent. It's not within societal normals [*sic*]."

Father testified he and mother were together for five years, during which she was essentially a nonpracticing Christian. He was unaware of anything in the Christian faith requiring the children's hair be cut. Father asserted his religious faith and mother's are not opposed, as "the kids can have their hair uncut and when they're old enough, they can make their own choice. But . . . she could still practice her faith, whatever that is at this point with the children and they could coexist."

On father's direct examination, father's counsel asked, "Do you recall [mother] sending a response to you indicating that you could practice your faith on your time and she could practice her faith on her time?" He answered in the affirmative. Counsel asked "how that would function if she cut their hair on your time [*sic*] and it remains uncut on yours. Was that a possibility to kind of coexist in that way?" Father replied, "No. It's either cut or uncut."

On the topic of the children's bracelets, father's counsel asked him: "When you sent the children [to mother's home]—when you were realizing they were not coming back with these bracelets, why did you send them with

the bracelets?" Father replied, "So it's against my faith to take them off. So I've never insisted that she practice my faith, but since birth [the children] had them on. And only as of the separation, in particular as of August [2022], [mother] made it clear that she's not going to allow them to wear them." Father said he "simply asked [the bracelets] be returned when the children came back to me." He claimed he never demanded the children keep the bracelets on while in mother's care.

Father was unsure but believed, based on photos he saw, that son did not wear his patka while in mother's care. After the son's visits with her, she returned the patkas only about 30 percent of the time.

Mother, who was self-represented, cross-examined father about the consequences of the children's hair having been cut:

"[Mother]: After someone's hair has been cut, is it possible for it to go back to being uncut?

"[Father]: You leave it.

"[The court]: You mean is it possible for it to grow back?

"[Mother]: No, I'm saying uncut hair—once the hair's cut, it's cut. There's no going back to uncut?

"[Father]: If you don't cut it, it's uncut. If you don't cut it again, it's uncut."

Mother cross-examined father about the age the children should be before they can decide for themselves about their haircuts:

"[Mother]: When [our daughter] asks if she can cut her hair, sitting in the haircut chair, if she can cut her hair to her shoulders like mine, like her sisters, is she of age to make that decision?

"[Father]: No.

"[Mother]: What I'm saying is what is the age she can make that decision?

"[Father]: It's not five. I can tell that.

"[Mother]: She's not five, she's seven.

"[Father]: Okay. When you started, which is a year ago, it's not five and it's not three for my son."

*Mother's Testimony*

During mother's testimony, without objection from father, the court asked her, "[Did your son] ask for a crew-cut?" She replied: "[M]y grandson . . . . [is] eight years old. My daughter has kept his hair very short for his whole entire life. He's never had long hair. And my son wanted to look like—he said, 'I want a haircut like [the grandson's].'" The court asked mother when she started cutting the children's hair, and she replied when son was around four months old, and daughter was around 13 months old.

Defense counsel asked mother on cross-examination: "When [father] has asked you—well, we've seen in the record there are multiple requests. What—other than responding to the children's apparent or alleged desire to have shorter hair, what consideration have you given to [father's] faith in making the decision to cut their hair?" Mother responded, "Like I said before, I have never agreed to raise the children Sikh. And I started cutting their hair back at a time where [father] wasn't as present of a parent, and he wasn't even aware that I was cutting their hair." Mother elaborated: "[Father] was not. I mean, he wasn't there. He wouldn't have noticed their hair a little bit shorter or whatever. He was coming and going months at a time. He never said, 'Do not cut the children's hair' at that time. He never made that statement. [¶] We never had a discussion about this until after the court proceedings started where he said, 'I am now going to practice my

7

Sikh faith, and the children's hair needs to be uncut.' Well, they've already had a haircut, so that's a moot point for their hair to stay uncut. Once it's cut, it can't go back to uncut. That was kind of my point. Their hair has been cut."

Mother testified about the children's bracelets in this colloquy:

"[Father's counsel]: Are there any [bracelet] sets that you have not returned [to father]?

"[Mother]: I'm sure—when the kids take them off, they usually put them in a spot. But like I've asked [father], when they don't wear them for a week, I can't always be responsible for where they go.

"[Father's counsel]: So your testimony is if the kids want their hair cut, they get their hair cut; correct? That's your testimony?

"[Mother]: Yeah.

"[Father's counsel]: If the kids take off their jewelry and it gets lost, so be it. Is that your testimony?

"[Mother]: Not necessarily.

"[Father's counsel]: What have you done to preserve these things? You know they take them off. You know that [father's] complaining that they're getting lost. What have you done to ensure that they go back to him, if anything?

"[Mother]: . . . [W]hat I've asked to just completely reduce the conflict is to do exactly what [father] did in the two years from 2020 to 2022. When the kids flew down on the airplane, he took those [bracelets] and he kept them with him. And then when he picked them up at the airport, he put them back on the kids. There is not a single message in those two years about any conflict with it. I'd simply just ask that we could continue to do that. [¶] So there was absolutely no conflict in that area. If the kids want to

8

take them off, which I've told him, then I'm responsible for finding those and I'm blamed if they're gone.  When if they just were to stay at his house [*sic*] preserved and special to put back on when they got home, there would never be a problem.

"[Father's counsel]:  You understand his testimony is that it's against his faith to take them off.

"[Mother]:  I understand that.  But for two years, from 2020 to 2022, during the plane exchanges, they didn't come to my house in Spokane for two weeks with the bracelets on.  So that's kind of—

"[Father's counsel]:  And his testimony is to the contrary, that [daughter] never took hers off until August of 2022; correct?

"[Mother]:  That is his testimony."

The court explored the bracelet issue with mother in this colloquy:

"[The court]:  . . . So my question is did you have a problem with [the children] wearing the bracelets before they ended up losing them?  My point is did you ever have a problem with them wearing the bracelets, 'Yes' or 'No'?

"[Mother]:  No.

"[The court]:  Okay.  And do you have a problem with them wearing the bracelets now?

"[Mother]:  I don't have a problem.  But if they want to take them off, I don't insist that they wear them.

"[The court]:  So is it your testimony that when they come to your home for the week, they immediately want to take them off?

"[Mother]:  They take them off, yes.

"[The court]:  And do you know why when they get to your home they immediately take them off?

"[Mother]:  I don't know.  They—

9

"[The court]:  You've never told them that they can just take them off?

"[Mother]:  I've told them if they don't want to—because my daughter has said, 'Papa makes us wear these.'  And I said, 'Whatever you want to do.'

"[The court]:  So you told them they don't have to wear them.

"[Mother]:  Yes."

*Court's Ruling on Hair, Patka and Bracelet Issues*

While the court was ruling from the bench, it addressed father:  "I've heard testimony that [son] sleeps in the head covering.  I've heard testimony . . . that sometimes [he] would say 'I don't want to wear the hair covering to sleep'.  . . . .  [¶]  But with respect to the hair that is so personal to the children, sir, you are going to have to compromise on that.  [Mom is] not going to be able to ever give [son] a cut like she did, the buzz cut, the crew cut.  But if [son] wants to wear his hair where he has a little bang there and he can put gel on it—he's only five.  When he starts school, he may want to start wearing it a different way.  I don't know.  But when he's in your care, he can wear the head covering.  When he goes to mom's house, he can have on the head covering."

The court addressed father's objections to its ruling in this colloquy:

"[The court]:  With respect to the hair, sir, by your own message you say you now have to put [daughter's] hair in two braids.  You are going to have to put her hair in two braids.  She likes her hair—first of all, the point is that their hair has already been cut.  It's no longer uncut.  At no time shall [son]—until, obviously, maybe at [age] 15 he is not going to listen to any of you and he might just get a crew cut.  So—but it's understandable that [daughter] wants to have shoulder-length hair like her mom.  It's understandable.  It shouldn't be because—I know you believe that she wants them to look White.  The reality is that her mom is White, you are not.

10

[Daughter] is a beautiful combination of both of you. [Son] is a beautiful combination of both of you, which is why I don't want them to feel I'm going to my mom's house now and I take everything related to dad off.

"[Father]: But cutting her hair is not against her religion, but it is mine. That is the difference.

"[The court]: Your testimony, sir, is it should be uncut. Her hair has been cut.

"[Father]: It can be uncut from this point.

"[The court]: I am not going to make that order. If [daughter]—it could be next year she wants to grow her hair down to her bottom, great. I am ordering that it should not be cut shorter than what it is now—is it at her shoulder?

"[Mother]: Yes, right here.

"[The court]: Where dad is prevented from braiding her hair. Her hair should be long enough where dad can braid it either in one braid or two braids. You say yourself, [in a chat conversation with mother], '[N]ow I have to braid it in two braids.' It may take you 30 more seconds.

"[Father]: It is not a matter of braiding it, your honor.

"[The court]: Listen, I understand.

"[Father]: It is the matter of the hair being cut. That is part of my faith.

"[The court]: I understand. I understand you don't agree with my order. [¶] From what I can see, this is a huge conflict. I'm trying to talk the conflict away. No one is going to be happy with my order. I don't see that any other judicial officer has dealt with it directly. So I've tried to balance, as the law requires me to, to make an order that is in the best interest of the children. So I understand that you don't agree with it, but I do not believe it

11

is appropriate for your daughter, who is going to be [eight years old], if she wants to wear her hair shoulder length that she cannot do so, that she must let it keep growing, something that tangible, that personal, personal to her. Again, I said this before, these are conversations that the two of you should have had when you decided to have children. So now the court has to be involved. So I understand you don't agree, but that is what the order is until another judge—if another judge makes a different order."

The court's written ruling states: "The court finds it is in the best interest of the children that the mother acknowledges and respects . . . father's Sikh faith and the fact that it is important to father that the children wear their bracelets on their right arm. Mother is ordered not to tell the children that they do not have to wear the bracelets. If, when the children are in mother's care, they express a desire to remove the bracelets, mother is ordered to place the bracelets within a box or [plastic] baggie for safekeeping, to assure that the bracelets are returned with the children when they return to father's care. . . . [F]ather is not required to remove the bracelets from the children's arms before exchanging the children with the mother."

The court added, "With respect to [son's] patka, the court again finds that it is in [his best interest] that the mother acknowledges and respects . . . father's Sikh faith and the fact that it is important to him that [son] wear the head covering. Mother is ordered not to tell [son] he does not have to wear it. If, when in mother's care, [son] expresses a desire to remove the patka, then mother is ordered to place the patka in a bag or container for safekeeping, so that it is returned with [son] when he returns to father's care."

The court concluded, "With respect to the hair, . . . father testified that the Sikh faith does not allow the children's hair to be cut at all. However, mother testified that he has known the children's hair was cut from the time

they were very young, and he never complained. In fact, mother testified that the cutting of the children's hair never became an issue until the court proceedings began. The court finds that it is in the best interest of the children to feel comfortable with their hair and the length of the hair. However, the court finds that there have been times when mother has engaged in cutting [son's] hair, in particular, to intentionally upset . . . father. The court orders that if the children express a desire to have their hair cut, they may have their hair cut; however, at no time shall [son] receive a buzz cut and at no time shall [daughter's] hair be cut shorter than shoulder length. This assures that her father will still be able to braid her hair, notwithstanding that it is in two braids, rather than one braid."

*Court's Ruling on Custody Issues*

The court ruled from the bench that father had failed to meet his burden of showing changed circumstances in order for it to modify the custody order: "[I]t would be against the children's best interest for me to give father sole legal custody, because it will only result in further conflict. The court finds that the sole legal custody he was given in August of 2022 has caused father to be less cooperative, to feel that he makes the rules and that the rules don't apply to him, the court orders don't apply to him, but they all apply to mom. So the court believes it would be dangerous to give father sole legal custody, because he will wield even more power than he already believes he has, even after Judge Mody changed the custody order to joint legal. . . . [¶] With respect to requesting that he have sole physical custody, the court has absolutely no reason to make such an order. These children have been through so much. Mother unlawfully took them [to Washington] in 2019. The judge made orders for her to keep them there. . . . [F]ather had to travel monthly to see his very young children. The court then made orders

13

that it was in their best interest for father to have sole legal custody and for the children to move here to California with him. So mom was then visiting. Now, mother has moved back to California. So these children have an opportunity that many kids don't where both of their parents live in the same city. So I am not going to order that mom only sees them on the weekend when they have been used to seeing her 50 percent of the time. There is no change in circumstances for me to do that. I don't find it would be in their best interest."

The court further ruled that under sections 3011 and 3020, the children should have frequent contact with both parents, as long as it is not contrary to their health, safety and welfare. The court relied on testimony about a weekend incident where "[mother] automatically had [the children] until Monday and there was another weekend when she only had them until Sunday. Well, [father] knew she was back. She was in the same city. He could have said, okay, you can have them until Monday. . . . This is not a person I would give the sole legal custody to." Based on that incident, the court ruled that under section 3040, subdivision (a)(1), father was not the parent who is more likely to allow the children frequent and continuing contact with the noncustodial parent.

Moreover, the court summarized testimony about an incident involving the children's care provider, "who knows mom, mom had called her and said she was running late, and the child care provider—father is her boss. She was going to do what her boss says. So she asked him, should she leave? And he said, yes. And he could have said, '[N]o. You can just let them go with mom.['] Their child care provider was there. [Father] said, no, regardless of the fact that those children were in the car and they saw their mom. And as the child care provider testified, they were so upset, they were

14

[hysterical] and should not have been in that position. That is another example of where father's determination to be rigid about court orders when it comes to mom, but yet he can ignore court orders, he cannot pay her child support. His request to have sole legal and sole physical custody, he has shown that that is not appropriate."

The court ordered the parties to have joint legal custody and joint physical custody.

## DISCUSSION

### I. *Hair, Patka, and Bracelets*

Father contends the family court "failed to provide the necessary legal protections for [his] right to raise his children in the Sikh faith. Instead of recognizing that allowing [m]other to continue cutting the children's hair constituted an ongoing violation of [his] religious freedoms, the trial court treated the matter as an issue of 'compromise' between the parents, rather than one of constitutional and statutory significance. In doing so, the court not only misapplied governing legal standards but also enabled continued religious interference that undermines [his] ability to instill the religious and cultural traditions that are central to the children's Sikh identity."

### A. *Applicable Law*

The United States Supreme Court has "recognized the fundamental right of parents to make decisions concerning the care, custody, and control of their children." (*Troxel v. Granville* (2000) 530 U.S. 57, 66 [and cases cited therein].) Parents have a constitutional right "to direct the upbringing and education of children under their control"; this includes "the inculcation of moral standards, religious beliefs, and elements of good citizenship." (*Wisconsin v. Yoder* (1972) 406 U.S. 205, 233.)

15

California courts have addressed the question whether or how to accommodate diverse religious practices of parents, living apart, in the upbringing of minor children: "[W]hile the custodial parent undoubtedly has the right to make ultimate decisions concerning the child's religious upbringing, a court will not enjoin the noncustodial parent from discussing religion with the child or involving the child in his or her religious activities in the absence of a showing that the child will be thereby harmed." (*In re Marriage of Murga* (1980) 103 Cal.App.3d 498, 505.) The parent seeking to enjoin the other parent from involving the children in religious activity bears the burden of making "a clear affirmative showing that these religious activities will be harmful to the child[ren ]." (*Id.* at pp. 505-506; *In re Marriage of Mentry* (1983) 142 Cal.App.3d 260, 266; *In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 117.)

B. *Analysis*

The evidence shows father has a sincere belief in his Sikh faith, which he practices, and that he has tried to raise his children in that faith from an early age. The court implicitly recognized this by ruling that it is in the children's best interests that mother acknowledges and respects father's Sikh faith. Despite thoughtfully grappling with the issues presented here, the court erred by failing to determine, under the caselaw cited above, whether mother had made a clear affirmative showing that if the children adhered to father's Sikh faith as regards the haircuts, patka and bracelets, it would be harmful to them. "[H]arm to the child from conflicting religious instructions or practices . . . should not be simply assumed or surmised; it must be demonstrated in detail." (*In re Marriage of Mentry, supra*, 142 Cal.App.3d at p. 265, italics omitted.)

16

Mother testified the children requested the haircuts, which made them fit in with their family and friends on her side. She added that the children's hair was already cut more than once. Likewise, mother's testimony regarding the use of the bracelets and the patka in summary was: As the children asked to take them off, she allowed them to do so. She should not be responsible for finding them before the children's return to father. She instead proposed he keep the bracelets at his house and thus eliminate any problem. Father also testified that at some point mother considered that the children's uncut hair was "unhygienic." But that testimony regarding hygiene was not developed or supported at the hearing, and therefore any claim in that regard lacks foundation. Judicial intervention in the children's religious upbringing must be "conditioned upon a clear affirmative showing of harm or likely harm to the child." (*In re Marriage of Mentry, supra*, 142 Cal.App.3d at p. 269.)

Additionally, the court specifically ruled that mother sometimes cut son's hair "to intentionally upset . . . father." Mother's conduct evinces a disregard for Judge Birchak's ruling, which was based on father's constitutional right to raise the children in his faith. Finally, the court's conclusion that the daughter's desired hair length is something "personal to her" is untethered from the constitutional requirement of a showing of harm before a parent's religious right may be abridged.

In reaching its ruling, the court characterized mother's testimony as "that [father] has known the children's hair was cut from the time they were very young, and he never complained." However, that characterization is not supported by the record. In fact, mother testified that when she cut the children's hair in their infancy, father never had occasion to notice it because he was "not as present a parent," and was gone for months at a time.

17

Mother's separate argument, which the court adopted, is that the children's hair, once cut, can no longer be uncut, and therefore further haircuts are permissible. But that reasoning overlooks father's repeated testimony that the previous haircuts are not determinative for purposes of religious observance because, in effect, the prior lapses may be ameliorated by prohibiting further haircuts.

The court's other fundamental error was subordinating father's constitutional rights to religious exercise and to raise the children in his faith to the children's personal desires and their "comfort" considerations. It specifically ruled: "If, when the children are in mother's care, *they express a desire* to remove the bracelets, mother is ordered to place the bracelets within a box or [plastic] baggie for safekeeping"; "[i]f, when in mother's care, [son] *expresses a desire* to remove the patka, then mother is ordered to place the patka in a bag or container for safekeeping;" and, "if the children *express a desire* to have their hair cut, they may have their hair cut." (Italics added.) It also reasoned, "[I]t is in the best interest of the children *to feel comfortable* with their hair and the length of the hair." (Italics added.) But at the time of trial, the children were seven and five years old respectively. The court nowhere explains, and the record fails to show, they had sufficient maturity to hold informed views about the religious observances at issue here. Under section 3042, subdivision (a), the court is only required to consider the preference of the child if the child "is of sufficient age and capacity to reason so as to form an intelligent preference as to custody[.]" We are not aware of any reported decision holding that a child of the ages of son and daughter had such capacity. (See *In re Marriage of Slayton* (2001) 86 Cal.App.4th 653, 659; accord, *Wisconsin v. Yoder, supra,* 406 U.S. at p. 232 ["There is nothing in the record or in the ordinary course of human experience to suggest

18

that . . . parents generally consult with children of ages 14-16 if they are placed in a church school of the parents' faith"].)

In light of the above, we reverse the portion of the court's ruling permitting either child's hair to be cut and deferring to their wishes regarding the removal of their bracelets or, for the son, his patka. The court is directed to conduct new proceedings specifically to ascertain whether the children's adherence to father's Sikh religion regarding the cutting of their hair, the use of bracelets, and son's use of a patka would harm the children. For the court's guidance in formulating a new order regarding these issues, a California case has set forth some general considerations: " '*In all events, the question that comes to the courts is whether, in particular circumstances, such exposures [to the parents' religious practices] are disturbing a child to its substantial injury, physical or emotional, and will have a like harmful tendency for the future.* [Citation.] The critical literature warns against perverting a quest for the child's best interests into one for the psychic comfort of the parents—a warning against overvaluing the parents' constitutional liberties. [Citation.] A warning is equally in order against depriving a parent of all connection with the child, or connection on the religious plane, out of an exaggerated fear of injury to the child. [Citations.] It is often said that if accommodation appears necessary, that form should be sought which intrudes least on the religious inclinations of either parent and is yet compatible with the health of the child.' " (*In re Marriage of Mentry, supra,* 142 Cal.App.3d at pp. 265-266, quoting *Felton v. Felton* (1981) 383 Mass. 232, 235 .)

## II. *Hearsay Testimony*

As stated, father did not object to the court's questions of mother about the children's haircuts; therefore, he has forfeited his claim the court abused

19

its discretion by admitting that assertedly hearsay testimony. "[T]he general rule [is] that trial counsel's failure to object to claimed evidentiary error on the same ground asserted on appeal results in a forfeiture of the issue on appeal." (*People v. Dykes* (2009) 46 Cal.4th 731, 756.) "What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling." (*People v. Partida* (2005) 37 Cal.4th 428, 435.)

In any event, our ruling renders moot father's contention. As he puts it in his brief, "this improperly admitted hearsay was outcome-determinative. By accepting mother's hearsay statements as dispositive of the children's preferences, the court side-stepped the constitutional implications of its ruling and improperly framed a fundamental rights issue as a question of transient child preference[.]" As our ruling has addressed the constitutional issue raised, we need not discuss this contention further.

### III. *Custody Decision*

Father contends: "[T]he evidence overwhelmingly established that [mother] repeatedly and willfully disregarded court orders governing religious practices and custodial exchanges, undermining both the children's religious identity and [father's] ability to exercise his custodial rights. The trial court acknowledged many of these violations but inexplicably refused to modify legal custody, leaving Father powerless to prevent further interference with his children's religious upbringing. This ruling fails to provide the necessary legal protections for [father's] fundamental rights." He urges reversal and a "remand with instructions to grant [him] sole legal custody, ensuring that decisions regarding religious upbringing and other

20

major custodial matters are made by the parent committed to respecting the children's established faith and court-ordered custodial structure."

The California Supreme Court has held: "Once the trial court has entered a final or permanent custody order reflecting that a particular custodial arrangement is in the best interest of the child, 'the paramount need for continuity and stability in custody arrangements—and the harm that may result from disruption of established patterns of care and emotional bonds with the primary caretaker—weigh heavily in favor of maintaining' that custody arrangement. [Citation.] In recognition of this policy concern, we have articulated a variation on the best interest standard, known as the changed circumstance rule, that the trial court must apply when a parent seeks modification of a final judicial custody determination. [Citations.] Under the changed circumstance rule, custody modification is appropriate only if the parent seeking modification demonstrates 'a significant change of circumstances' indicating that a different custody arrangement would be in the child's best interest." (*In re Marriage of Brown & Yana* (2006) 37 Cal.4th 947, 956.)

"The standard of appellate review of custody and visitation orders is the deferential abuse of discretion test. [Citation.] The precise measure is whether the trial court could have reasonably concluded that the order in question advanced the 'best interest' of the child." (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) "Under this test, we must uphold the trial court 'ruling if it is correct on any basis, regardless of whether such basis was actually invoked.'" (*Montenegro v. Diaz* (2001) 26 Cal.4th 249, 255.)

The court provided several reasons for its finding of no changed circumstances to justify modifying the custody order: Father had changed since Judge Birchak's order: he was less cooperative with mother and had

21

assumed the court orders applied only to her, but not to him.  It pointed to instances where father deliberately denied mother any consideration regarding visitation matters.  It specifically relied on section 3040, subdivision (a)(1), which provides: "In making an order granting custody to either parent, the court shall consider, among other factors, which parent is more likely to allow the child frequent and continuing contact with the noncustodial parent[.]"  It referred to section 3011, dealing with considerations of the best interests of the children, and section 3020 which provides that the health, safety, and welfare of children shall be the court's primary concern in determining the best interests of children when making any orders regarding the physical or legal custody or visitation of children.  We conclude the court's ruling was not arbitrary and capricious" and did not "exceed[ ] the bounds of reason" (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598) so as to constitute an abuse of discretion.

Father has not addressed the specific bases for the court's ruling, instead arguing in his opening brief, without citation to legal authority or to the record:  "[T]he court's own reasoning demonstrates why joint legal custody is unworkable in this case.  The trial court found that both parents have engaged in conflict, yet it failed to acknowledge that pattern of [m]other unilateral decision-making, interference with religious practice, and disregard for court orders is the primary driver of that conflict."  As shown, this characterization of the court's ruling is at best partial and incomplete.  It does not compel reversal of the court's custody ruling.

## DISPOSITION

The part of the judgment titled "Legal custody" is affirmed. The part of the judgment titled "Hair, Patka and bracelet issue" is reversed. On remand, the court is directed to determine whether the religious practices of barring haircuts, requiring the wearing of bracelets, and requiring the son to wear a head covering will be harmful to the children, and to enter a new order on these issues in accordance with this opinion. Each party is to bear its own costs on appeal.


O'ROURKE, J.

WE CONCUR:


McCONNELL, P. J.


CASTILLO, J.

23