[No. B083168. Second Dist., Div. Three. Jan. 31, 1996.]

In re the Marriage of MARTIN MEYER and MARSHA NADEEN WEISS.
MARTIN MEYER WEISS, Appellant, v.
MARSHA NADEEN WEISS, Respondent.

108

**COUNSEL**

Martin Meyer Weiss, in pro. per., for Appellant.

Rehwald, Rameson, Lewis & Glasner and Thomas Trent Lewis for Respondent.

**OPINION**

**KLEIN, P. J.**—Martin Meyer Weiss (Martin), in propria persona, appeals a further judgment on reserved issues, involving the religious upbringing of

the child (the minor) born of his marriage to Marsha Nadeen Weiss (Marsha).[1] Martin also purports to appeal pendente lite attorney fees orders.

At the present time, Martin and Marsha apparently are adherents of different religions, although during the marriage they practiced the same faith. The essential issue presented is whether the trial court properly denied Martin's request that Marsha be enjoined from engaging in certain religious activity with the child.

We conclude Marsha's written antenuptial commitment concerning the future religious upbringing of any children born of the marriage is not legally enforceable. Further, Martin did not meet his burden of presenting a clear affirmative showing the child would be harmed by Marsha's conduct. Therefore, the trial court properly refused to enjoin Marsha's religious activity with their child.

### FACTUAL AND PROCEDURAL BACKGROUND

The parties were married in 1984. Martin is Jewish. One month before the marriage, Marsha, who was a Baptist, converted to Judaism. At the time of her conversion, she executed a "Declaration of Faith," witnessed by three rabbis, "pledg[ing] to rear all [their] children . . . in loyalty to the Jewish faith and its practices."

The parties have a son, the minor, born in 1985.

In December 1989, Martin filed a petition for dissolution of marriage.

On July 29, 1991, the trial court entered an attorney fees order directing Martin to pay Marsha $10,000 as a contributive share of her attorney fees and costs.

On August 25, 1992, judgment of dissolution as to status only was entered, reserving jurisdiction over remaining issues, including custody.

On August 25 through 28, 1992, the bifurcated issues of the minor's custody were litigated. Both parents testified. Marsha was now attending the Calvary Church. She had enrolled the minor in Sunday school at the church. In addition, the minor had attended a club meeting at the church on Wednesday evenings and had gone to the church camp the previous summer. Martin

---

[1]We refer to the parties by their first names for purposes of clarity and not out of disrespect. (See *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1 [30 Cal.Rptr.2d 306]; *Askew* v. *Askew* (1994) 22 Cal.App.4th 942, 947, fn. 6 [28 Cal.Rptr.2d 284].)

acknowledged Marsha had the right to expose the minor to her religion, but objected to the minor's being indoctrinated in the Christian faith or being enrolled in any activity "that would be contrary to his Jewish faith."

On November 5, 1992, the trial court ordered Martin to pay an additional $12,000 of Marsha's attorney fees and costs.

On August 4, 1993, the trial court entered a further judgment on the reserved issue of custody. The trial court refrained from restraining either parent's religious activity with the minor. It ruled, *inter alia:*

The parties were awarded joint physical and legal custody of the minor. The minor was to spend every Monday and Tuesday with Marsha and every Wednesday and Thursday with Martin. Each party was awarded alternate weekends, from Friday after school until Monday morning.

As for religious holidays, Martin had the first and second day of Passover, Yom Kippur and Rosh Hashanah. Marsha was allotted Purim and the third night of Passover, conditioned upon her taking the minor to a synagogue service on those holidays. In addition, she was awarded Christmas Eve, Christmas Day and Easter Sunday.

With respect to enrollment in religious studies, Martin was permitted to enroll the minor "in Hebrew Jewish Studies program, up to two times per week, regardless of [his] custody schedule. This religious training program shall have priority over any other schedule or activity. Except as provided herein above, nothing in this Order is deemed to prevent either party from enrolling the child in or having the child participate in other religious programs or activities during their respective custodial time."

On October 1, 1993, Martin filed notice of appeal from the August 4, 1993, further judgment on reserved issues. The notice of appeal also specified the trial court's July 29, 1991, and November 5, 1992, orders for contributory attorney fees.

## CONTENTIONS

The essence of Martin's numerous contentions is that the trial court erred in refusing to enjoin Marsha from engaging the minor in religious activity, and in making the attorney fees orders.

DISCUSSION

*1. A parent will not be enjoined from involving a child with the parent's religious activities absent a clear affirmative showing of harm.*

■ As was stated in *Zummo v. Zummo* (1990) 394 Pa.Super. 30 [574 A.2d 1130, 1132], "[c]ustody and visitation cases essentially involve salvaging operations. Judges are asked to preserve, as best as may be, the interests of any children involved, while at the same time disentangling their parent's spousal relationship. Under the best of circumstances it is a task requiring Solomonic judgment. [¶] *The difficulties involved are compounded when emotional issues such as the religious upbringing of children are involved.*" (Italics added.)

Here, the issues of the minor's religious upbringing and the enforceability of the parties' antenuptial agreement require sensitivity to the best interests of the child as well as the First Amendment rights of both parents. Our focus is upon the showing required before a court will enjoin Marsha from exposing the minor to her faith.

The United States Supreme Court specifically has held parental authority in matters of religious upbringing may be encroached upon only upon a showing of a "substantial threat" of harm to the "physical or mental health of the child or to the public safety, peace, order, or welfare." (*Wisconsin v. Yoder* (1972) 406 U.S. 205, 230 [32 L.Ed.2d 15, 33, 92 S.Ct. 1526]; see *Zummo v. Zummo, supra,* 574 A.2d at p. 1138.) *Yoder* explained "only those interests of the highest order and those not otherwise served can overbalance legitimate claims to the free exercise of religion." (406 U.S. at p. 215 [32 L.Ed.2d at p. 25].)[2, 3] This fundamental principle informs our decision.

Turning to California law, the case of *In re Marriage of Murga* (1980) 103 Cal.App.3d 498 [163 Cal.Rptr. 79], did not involve an antenuptial religious

---

[2]*Wisconsin v. Yoder, supra,* 406 U.S. at page 234 [32 L.Ed.2d at pp. 35-36], held the First and Fourteenth Amendments prevented the state from compelling Amish parents to send their children to formal high school to age 16.

[3]The Religious Freedom Restoration Act of 1993 (RFRA), in its declaration of purpose, states the Congress finds "in Employment Division v. Smith, 494 U.S. 872 [108 L.Ed.2d 876, 110 S.Ct. 1595] (1990) the Supreme Court virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion." (42 U.S.C. § 2000bb(a)(4).) Congress responded to that Supreme Court decision by enacting the RFRA "to restore the compelling interest test as set forth in Sherbert v. Verner, 374 U.S. 398 [10 L.Ed.2d 965, 83 S.Ct. 1790] (1963) and Wisconsin v. Yoder, 406 U.S. 205 [32 L.Ed.2d 15, 92 S.Ct. 1526] (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened." (42 U.S.C. § 2000bb(b)(1); see, e.g., *Jolly v. Coughlin* (S.D.N.Y. 1995) 894 F.Supp.734, 740-741.)

upbringing agreement but it nonetheless is relevant to the issues before us. *Murga* adopted a rule of nonintervention with respect to a noncustodial parent's right to express his or her religious beliefs.

The question presented in *Murga* was "whether, *in the absence of a showing of harm to the child*, the custodial parent may enjoin the noncustodial parent from discussing religious subjects with the child or from involving the child in the noncustodial parent's religious activities." (*In re Marriage of Murga, supra*, 103 Cal.App.3d at p. 504, italics added.) Given the dearth of California authority, *Murga* looked to the case law of other states. It found "in the majority of American jurisdictions that have considered the question, the courts have refused to restrain the noncustodial parent from exposing the minor child to his or her religious beliefs and practices, *absent a clear, affirmative showing that these religious activities will be harmful to the child.*" (*Id.*, at pp. 504-505, italics added.)

*Murga* reasoned adoption of the majority rule in California "would be consonant with the rule consistently followed by our courts that custody decisions will not be governed by the religious tenets or practices of parents absent a clear showing that the parent's religious practices would be harmful to the child." (*In re Marriage of Murga, supra*, 103 Cal.App.3d at p. 505.) *Murga* also observed "[t]he refusal to intervene in the absence of a showing of harm to the child reflects the protected nature of religious activities and expressions of belief, as well as the proscription against preferring one religion over another. [Citations.]" (*Ibid.*) Additionally, *Murga* was mindful of the public policy of this state to assure minor children of "frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, . . ." (Civ. Code, former § 4600; see now Fam. Code, § 3020; *Murga, supra*, at pp. 502-503.)

Consequently, *Murga* concluded ". . . a court will not enjoin the noncustodial parent from discussing religion with the child or involving the child in his or her religious activities in the absence of a showing that the child will be thereby harmed." (*In re Marriage of Murga, supra*, 103 Cal.App.3d at p. 505.)

A subsequent California case, *In re Marriage of Mentry* (1983) 142 Cal.App.3d 260, 261-262 [190 Cal.Rptr. 843], invalidated a restraining order which prohibited the father "from engaging the children of the dissolved marriage in any religious activity, discussion, or attendance during visitations and from providing them with articles, publications, or other religious material, while they [were] in his presence."

*Mentry* cited with approval *Felton* v. *Felton* (1981) 383 Mass. 232 [418 N.E.2d 606, 607, 22 A.L.R.4th 961], which stated "harm to the child from

conflicting religious instructions or practices, . . . should not be simply assumed or surmised; it must be demonstrated in detail." (*In re Marriage of Mentry, supra*, 142 Cal.App.3d at p. 265, italics omitted.) After a review of the evidence, *Mentry* reversed, finding an absence of harm to the children. (*Id.,* at p. 262.) With respect to the evidence of alleged harm, *Mentry* concluded: "Boiled down, it simply consists of testimony by the mother concerning her distress at [the father's] religious activities with the children, and speculative testimony by a counselor who had never seen or interviewed the children. There was evidence that the boy had social adjustment problems in school for which he had received psychological counseling, but no evidence relating these problems, or periodic stomach aches which both children assertedly suffered, to conflict over religion. There is no evidence of any other physical, or emotional, problems. Indeed, the mother conceded that aside from the stomach aches and some aggressive behavior of the son, 'the children are basically physically and mentally well adjusted' and are both 'normal . . . in every aspect.' The record contains no competent evidence that the children will in the future be harmed by the parental religious conflict. [The mother] has thus *failed to meet her burden of 'a clear affirmative showing that these religious activities will be harmful to the child*[*ren*].' " (*Id.,* at p. 266, italics added.)

2.  *Zummo, refusing to enforce an antenuptial religious upbringing agreement, is in accord with Murga and Mentry.*

After the California decisions in *Murga* and *Mentry*, a Pennsylvania appellate court decided *Zummo* v. *Zummo, supra*, 574 A.2d 1130 in 1990 in an exhaustively researched and well-reasoned opinion. Given the lack of pertinent California authority, it is appropriate to examine how our sister state has dealt with the issue of differing religious practices by parents in the aftermath of a divorce, against the backdrop of an antenuptial agreement concerning religious upbringing. (See *In re Marriage of Murga, supra*, 103 Cal.App.3d at pp. 504-505.)

*Zummo* involved a 10-year marriage between a Roman Catholic father and Jewish mother. Their three children were being raised in the Jewish faith. Prior to the marriage, the parents discussed their religious differences and orally agreed any children they might have would be raised as Jews. (*Zummo* v. *Zummo, supra*, 574 A.2d at pp. 1141, 1145.) Following a divorce and shared custody, issues arose concerning religious exposure during custodial periods with the father. The trial court made a custody order requiring the father to arrange the children's attendance at their synagogue's Sunday school during his weekend visitation. The trial court also *prohibited* the father from taking his children to religious services *"contrary to the Jewish*

*faith*" during his periods of lawful custody or visitation. (*Id.*, at p. 1142.) The father appealed, asserting his constitutional rights were violated by the order.

*Zummo* struck down that restriction, observing "[u]nder Pennsylvania law, each parent has parental authority during lawful periods of custody or visitation. Consequently, such a parent may pursue whatever course of religious indoctrination which that parent sees fit, at that time, during periods of lawful custody or visitation. [Citations.] If the other parent objects and seeks restrictions, the objecting parent must establish a substantial risk of harm in absence of the restriction proposed." (*Zummo* v. *Zummo, supra,* 574 A.2d at p. 1140.)

In arriving at its decision, *Zummo* went to great lengths to advise itself as to existing law throughout the United States through resort to appellate decisions and learned commentators on the issue of whether a predivorce agreement regarding the religious upbringing of children may be given legal effect over the objections of one of the parties to the agreement. (*Zummo* v. *Zummo, supra,* 574 A.2d at p. 1144.) In determining such agreements are not legally enforceable, *Zummo* found "several persuasive grounds upon which to deny legal effect to such agreements: [¶] 1) such agreements are generally too vague to demonstrate a meeting of minds, or to provide an adequate basis for objective enforcement; [¶] 2) enforcement of such an agreement would promote a particular religion, serve little or no secular purpose, and would excessively entangle the court in religious matters; and [¶] 3) enforcement would be contrary to a public policy embodied in the First Amendment Establishment and Free Exercise Clauses (as well as their state equivalents) that parents be free to doubt, question, and change their beliefs, and that they be free to instruct their children in accordance with those beliefs." (*Zummo, supra,* 574 A.2d at p. 1144.)

Thus, *Zummo* held, similarly to the earlier decisions of *Murga* and *Mentry*, ". . . each parent must be free to provide religious exposure and instruction, as that parent sees fit, during any and all period[s] of legal custody or visitation without restriction, unless the challenged beliefs or conduct of the parent are demonstrated to present a *substantial threat of present or future, physical or emotional harm* to the child in absence of the proposed restriction." (*Zummo* v. *Zummo, supra,* 574 A.2d at pp. 1154-1155, italics added.)

Consequently, "while religious upbringing agreements may serve an important and beneficial purpose by promoting careful consideration of potential difficulties prior to marriage, . . . a hopeful . . . prenuptial assurance of a future commitment to an agreed . . . course of religious instruction for then as yet unborn children in the event of divorce (an often unconsidered

possibility), *must remain as legally unenforceable in civil courts as the wedding vows the parties even more solemnly exchanged."* (*Zummo* v. *Zummo, supra,* 574 A.2d at p. 1147, italics added.)

### a. *No presumption of harm from mixed religious upbringing.*

With respect to the likelihood of harm to the child as a consequence of exposure to inconsistent religious teachings, *Zummo* "rejected speculation by parents and by experts as to potential future emotional harm to a *particular* child based upon the assumption that such exposure is *generally harmful*." (*Zummo* v. *Zummo, supra,* 574 A.2d at p. 1155, some italics added.) *Zummo* ruled "the speculative possibility of mere disquietude, disorientation, or confusion arising from exposure to 'contradictory' religions would be a patently insufficient 'emotional harm' to justify encroachment by the government upon constitutional parental and religious rights of parents, even in the context of divorce." (*Ibid.*) *Zummo* also recognized, as does this court, that emotional distress to a child "arising from a parental dispute regarding a child's religious upbringing may depend more on the manner in which the dispute is conducted, than the theological aspects of the dispute itself." (*Id.,* at p. 1156.)

Refusing to presume that exposing a child to contradictory religions is generally harmful, *Zummo* held ". . . in order to justify restrictions upon parent's rights to inculcate religious beliefs in their children, the party seeking the restriction must demonstrate by competent evidence that the belief or practice of the party to be restricted actually presents a substantial threat of present or future physical or emotional harm to the particular child or children involved in absence of the proposed restriction, and that the restriction is the least intrusive means adequate to prevent the specified harm." (*Zummo* v. *Zummo, supra,* 574 A.2d at p. 1157.)[4, 5]

### b. *Martin's critique of Zummo.*

Understandably, Martin feels passionately about his son, his religion and his son's religious upbringing. Few aspects of the human condition can rival

---

[4]It is unnecessary for us to repeat *Zummo*'s extensive analysis. Suffice it to say *Zummo* is exceedingly broad in its scope. It begins with the historical background of the issue, including religious freedom as considered by the founding fathers, parental authority over offspring, parental authority over childrearing as augmented by the right to religious freedom under the First Amendment, and postdivorce parental authority and religious freedom. *Zummo* goes on to discuss predivorce religious training agreements; it examined the children's predivorce religious training, whether it is constitutionally permissible to consider the interest of the children's spiritual stability or which parent is more "devout," the relevance of perceived differences in religions, the perceived probability of harmful effects from exposure to "inconsistent" religions, and whether a parent may be directed to take children to religious school in furtherance of the religious indoctrination sought by the other parent. This court is fortunate to have *Zummo* on the books as a resource in this troubling area of the law.

the emotional power of the combination of issues presented in this case. Martin's primary criticism of *Zummo* is its assertion that exposure to contradictory religions is generally not harmful to children. (*Zummo v. Zummo, supra,* 574 A.2d at pp. 1156-1157.) Given the constitutional dimensions of the matter, it appears to this court *Zummo* wisely declines to speculate that such exposure is harmful, and instead, requires the party seeking the restriction to demonstrate by competent evidence the belief or practice of the party to be restricted actually presents a substantial threat of harm to the child. (*Zummo v Zummo, supra,* at pp. 1154-1155, 1157.)

### 3. *Mentry has not been superseded by the RFRA.*

Marsha argues California's *Mentry* standard has been superseded by the RFRA (42 U.S.C. § 2000bb et seq.), and this court should clarify the act's impact upon *Mentry.*

Briefly, the act states in relevant part at 42 United States Code section 2000bb-1: "(a) . . . Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b). [¶] (b) . . . Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person— [¶] (1) is in furtherance of a compelling government interest; and [¶] (2) is the least restrictive means of furthering that compelling governmental interest."[6]

The act, prohibiting the government from substantially burdening a person's exercise of religion unless the infringement is essential to furtherance of a compelling state interest, is easily reconciled with *Mentry. Mentry* requires " 'a clear affirmative showing that [the] religious activities will be harmful to the [child]' " before the parent will be enjoined. (*In re Marriage of Mentry, supra,* 142 Cal.App.3d at p. 266.) Obviously, the prevention of harm to the child, which was the concern of *Mentry,* is a compelling state interest. Therefore, the *Mentry* standard for burdening a parent's exercise of religion is consistent with the act.

### 4. *Trial court properly declined to enjoin Marsha because the record supports a finding of a lack of harm to the minor.*

■ Marsha testified: she had never received any report the minor was a discipline problem at any of the events he had attended at Calvary Church.

---

[5]In a dissent, the third judge concluded the trial court properly considered the children's best interests and exercised sound discretion in ordering the father not take them to church. (*Zummo v. Zummo, supra,* 574 A.2d at p. 1158.)

[6]The act is retroactive, "appl[ying] to all Federal and State law, and the implementation of that law, whether statutory or otherwise, and whether adopted before or after [November 16, 1993]." (42 U.S.C. § 2000bb-3(a).)

She had never observed the minor crying upon picking him up from Sunday school, or from the Wednesday night activity. Nor were there any problems with the minor after his having attended camp. He had not been in any fights and she did not observe any bruises upon him.

This evidence supports the conclusion the minor is not being harmed by the religious activity in issue. Based on this state of the record, the trial court properly could find Martin had failed to meet his burden of making " 'a clear affirmative showing that these religious activities [are] harmful to the [child].' " (*In re Marriage of Mentry, supra*, 142 Cal.App.3d at p. 266.) Accordingly, the trial court properly refused to enjoin Marsha from involving the minor in religious activity.[7]

5. *Marsha's antenuptial written promise to raise her children in her spouse's faith is not legally enforceable.*

█ Leaving aside the issue of harm to the minor, Martin contends Marsha is contractually bound by her written antenuptial declaration of faith to raise the minor in the Jewish religion. Martin's reliance on the contract is misplaced.

In *Zummo*, enforcement of such an agreement was refused. *Zummo* recognized enforcement of the agreement and of the trial court's order prohibiting the father from taking his children to " 'religious services contrary to the Jewish' " faith would have entangled the court in issues such as "[w]hat constitutes a 'religious service?' " and which services "are 'contrary' to the Jewish faith?" (*Zummo v. Zummo, supra*, 574 A.2d at p. 1146.)

*Zummo* also recognized enforcement would have "encroached[d] upon the fundamental right of individuals to question, to doubt, and to change their religious convictions, and to expose their children to their changed beliefs. [¶] The constitutional freedom to question, to doubt, and to change one's convictions, protected by the Free Exercise and Establishment Clauses, is important for very pragmatic reasons. For most people religious development is a lifelong dynamic process even when they continue to adhere to the same religion, denomination, or sect. [Fn. omitted.] . . . [¶] . . . [¶] The

---

[7]Notwithstanding the above evidence, Martin contends the minor is being harmed by being raised simultaneously in two conflicting religions. To the extent Martin relies on matter outside the record, such as a postjudgment letter from wife's counsel discussing the minor's behavioral problems related to the religious conflict, it cannot be considered on this appeal. However, Martin is not precluded from making a new showing in the trial court based on a change of circumstances since the 1992 hearing.

First Amendment specifically preserves the essential religious freedom for individuals to grow, to shape, and to amend this important aspect of their lives, and the lives of their children. Religious freedom was recognized by our founding fathers to be *inalienable*. It remains so today. Thus, *while we agree that a parent's religious freedom may yield to other compelling interests, we conclude that it may not be bargained away*." (*Zummo* v. *Zummo, supra*, 574 A.2d at pp. 1146-1148, last italics added.)

We recognize the agreement in *Zummo* was oral, whereas here it is written. However, that is a distinction without a difference because the outcome in *Zummo* did not turn on the lack of a writing.

*Zummo*'s various reasons for refusing to enforce the parties' agreement therein are compelling here. For example, the instant case amply illustrates the potential for judicial entanglement. As indicated, Martin concedes Marsha has the right "to expose" the minor to her religion but objects to the minor "being indoctrinated" in the Christian faith. Martin testified he would permit the minor to go to church with Marsha as an observer and even to sing hymns along with the rest of the congregation, but he would object to the minor's joining a children's choir group, or enrolling in a Bible study group or in any education in the Christian faith. Given the fine and perhaps illusory line between exposure and indoctrination, improper judicial entanglement in religious matters would be inevitable if Martin's request were to be accommodated.

Further, in view of Marsha's *inalienable* First Amendment right to the free exercise of religion, which includes the right to change her religious beliefs and to share those beliefs with her offspring, her antenuptial commitment to raise her children in Martin's faith is not legally enforceable for that reason as well.

For these reasons, Martin's reliance on the antenuptial agreement, albeit written, to control the minor's religious upbringing is unavailing.

6. *Martin's untimely appeal from the attorney fees orders bars consideration of those issues.*

As indicated, Martin's October 1, 1993, notice of appeal from the August 4, 1993, further judgment on reserved issues also specified the trial court's July 29, 1991, and November 5, 1992, orders for contributory attorney fees, which orders directed him to pay $10,000 and $12,000, respectively.

We look "to the substance of an order pendente lite rather than to chronology or to form" to determine whether the order is directly appealable. (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368 [134 Cal.Rptr. 197, 556 P.2d 297]; accord, *Kinoshita* v. *Horio* (1986) 186 Cal.App.3d 959, 963 [231 Cal.Rptr. 241].) "When a court renders an interlocutory order collateral to the main issue, dispositive of the rights of the parties in relation to the collateral matter, and directing payment of money or performance of an act, direct appeal may be taken. [Citations.]" (*In re Marriage of Skelley, supra*, 18 Cal.3d at p. 368.) Such a determination is substantially the same as a final judgment in an independent proceeding. (*Ibid.*) Thus, a direct appeal lies from a pendente lite attorney fees order where nothing remains for judicial determination except the issue of compliance or noncompliance with its terms. (*Id.,* at pp. 368-370; *Askew* v. *Askew, supra*, 22 Cal.App.4th at p. 964, fn. 37; *Kinoshita* v. *Horio, supra*, at p. 963.)[8]

"The law of this state does not allow, on an appeal from a judgment, a review of any decision or order from which an appeal might previously have been taken. [Citations.]" (*Woodman* v. *Ackerman* (1967) 249 Cal.App.2d 644, 648 [57 Cal.Rptr. 687].) Specifically, Code of Civil Procedure section 906, pertaining to the powers of an appellate court, states in relevant part: "The provisions of this section do not authorize the reviewing court to review any decision or order from which an appeal might have been taken." Because Martin did not appeal from the immediately appealable pendente lite attorney fees orders of July 29, 1991, and November 5, 1992, those orders became final and binding upon him. Accordingly, the purported appeals from the attorney fees orders must be dismissed.[9]

### 7. *Remaining issues not reached.*

Martin's remaining arguments are without merit and any discussion of them is unnecessary.[10]

---

[8]In recognizing the availability of a direct appeal from such an order, our Supreme Court in *In re Marriage of Skelley*, observed: "This court is not unmindful of the monumental workload of the Courts of Appeal. However, 90 years of judicial approval and recent legislative affirmation tell us judicial economy cannot be invoked to outweigh the right of appeal for those subject to an order tantamount to a final judgment." (*In re Marriage of Skelley, supra*, 18 Cal.3d at p. 370.)

[9]In any event, Martin appears to have abandoned the merits of the attorney fees issue. The reply brief states: "There is no specific demand, as such, for return of [the attorney] fees. There is a demand for recognition that the unwarranted application of those fees critically compromised [his] efforts at presenting his case."

[10]Martin's request the names of the parties be omitted from the opinion is denied in that this case does not meet the standards for nondisclosure. (See Cal. Style Manual (3d ed. 1986) § 213, p. 146.) Also, Martin's request for family anonymity is complicated by the fact Martin

## DISPOSITION

The further judgment on reserved issues is affirmed. The purported appeals from the attorney fees orders are dismissed. Marsha to recover costs on appeal.

Croskey, J., and Kitching, J., concurred.

A petition for a rehearing was denied February 22, 1996, and appellant's petition for review by the Supreme Court was denied May 1, 1996.

---

is acting as his own counsel and has even authored a law review article covering the topic, which he has cited to us.