Filed 4/30/13  Marriage of Rica CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **In re the Marriage of MELISSA A. and NICK A. RICA.** | |
| **MELISSA A. RICA,** | |
| **Respondent,** | **A135687** |
| **v.** | |
| **NICK A. RICA,** | **(Alameda County** |
| **Appellant.** | **Super. Ct. No. VF05208213)** |

In 2008, Melissa Rica moved to modify the child support obligation of her former husband, appellant Nick Rica, based on an alleged increase in his income since a 2006 judgment of dissolution.[1]  Shortly thereafter, Nick moved to modify both his child support and spousal support obligations to reflect an alleged decrease in his income due to the loss of his job and financial support Melissa was receiving from her boyfriend.  The trial court granted Melissa's motion, denied Nick's motion, and awarded Melissa her attorney fees and costs.  On appeal from the trial court's order, Nick challenges (1) the income on which the court relied in calculating support, and (2) the attorney fee award.

The trial court's order is reversed as it relates to Melissa's motion to modify child support, as we conclude the trial court's income determination was arbitrary and not supported by substantial evidence.  The trial court's order is affirmed in all other respects.

---

[1]  As the parties refer to each other by their first names, we do so as well.

BACKGROUND

Nick and Melissa were married on June 1, 1985, and had two children, born in June 1990 and May 1992.

*The Judgment of Dissolution*

On November 15, 2006, the court entered a judgment of dissolution terminating the marriage. Pursuant to a marital settlement agreement, the court ordered Nick to pay monthly child support of $2,264, plus additional amounts for bonus income. Child support was to terminate when a child was emancipated or reached the age of 18, except an unemancipated child was entitled to support until he completed grade 12. When support for one child terminated, support for the other child was to continue at $1,438 a month. The court awarded monthly spousal support of $1,833 to Melissa. These awards were based on monthly income of $12,695 for Nick ($152,340 a year), and $1,500 for Melissa ($18,000 a year).

*The Parties' Motions*

Two years later, on November 21, 2008, Melissa filed a motion for modification of child support and for attorney fees and costs in connection with the motion. In a supporting declaration, she stated the parties' older son was emancipated, and they had one remaining minor child, age 16. Relying on Nick's 2007 tax returns, Melissa alleged his income had increased dramatically since the judgment. In an income and expense declaration, she acknowledged her own average monthly income had increased to $2,496 and listed a $75,000 debt to her boyfriend, David Gilpin.

In March 2009, Nick filed a responsive declaration consenting to a support order under the child support guidelines, but stating his income had decreased in 2008 when he was laid off from his job and started his own consulting business, NA Consulting, Inc. In an income and expense declaration, he estimated his average gross monthly income was $8,781, $6,800 the previous month; noted a $3,000 a month rental property loss; and claimed $7,714 in average monthly expenses. He attached a statement prepared on February 1, 2009, purporting to set out "expense data" for his business from April 2008

to January 2009, including its gross receipts and expenses, amounts he paid himself, and the company's net profits or losses.

On March 10, 2009, the court entered an order on the parties' stipulation, requiring Nick to pay $1,438 a month in child support on a temporary basis and to provide a profit and loss statement for his business. The court reserved jurisdiction to modify the support amount up or down from November 21, 2008, the date Melissa filed her motion, based on its findings regarding Nick's income.

Six weeks later, on April 24, 2009, Melissa sought an order to show cause (OSC) for contempt, alleging Nick had failed to pay $1,992 in child support and $6,468 in spousal support from January to April 2009. The court issued an OSC and set the matter for hearing.

On or about June 2, 2009, Melissa filed an income and expense declaration showing she now owed Gilpin nearly $99,000.

On June 9, 2009, Nick filed a motion to modify child support and spousal support, seeking a reduction based on a decrease in his income due to the loss of his job, and Melissa's receipt of additional income from Gilpin. He stated his consulting business was not doing well due to the economy. Nick attached a termination letter from his former employer, FormFactor. The letter stated the company was downsizing due to market conditions and Nick's last day of work would be February 4, 2008; he would continue to receive his regular pay, including bonuses he was due, until his termination date, April 4, 2008; his final paycheck would include his unused paid time off; and he could obtain enhanced severance benefits if he signed a general release. In addition, Nick said the first and second mortgages on his house ($847,000) exceeded its value; as he could not afford the payments, he was forced to rent it at a $3,000 a month loss. An attached printout from a real estate Web site estimated the home's value at $672,500. Nick filed an income and expense declaration showing average income of $5,042 a

month[2] and attached a statement prepared by his accountant that purported to show his business revenues and expenses through March 31, 2009.

On or about July 31, 2009, Melissa submitted another affidavit seeking an OSC for contempt, stating Nick had failed to pay an additional $3,320 in child support and $5,922 in spousal support from May through July 2009. The court issued an OSC and set the matter for hearing.

Nick's child support obligation ended in June 2010, when the parties' remaining minor child graduated from high school. His spousal support obligation ended on July 31, 2010, when Melissa married Gilpin.

*The Contempt Proceedings*

In January 2011, the court found Nick guilty of 13 counts of contempt.[3] The court found he had effectively conceded he was in contempt of the court's child support orders for months in which he failed to pay anything, as he admitted he might have been able to pay a reduced support amount during those periods. The court also noted evidence clearly establishing that Nick had some income or access to liquid assets during the relevant months and paid his other creditors first. In addition, the court found Nick had voluntarily contributed to the household expenses of his girlfriend, with whom he lived, rather than paying court-ordered spousal support.

Nick used funds from his share of the community retirement account to satisfy the contempt arrears. On March 10, 2011, the court suspended imposition of a jail sentence

---

[2]  Nick's income and expense declaration reported this income as "[d]ividends/interest" in the section for "[i]nvestment income." He later testified that this should have been reported in the section for "[i]ncome from self-employment," which appears directly below the "[i]nvestment income" section on the form.

[3]  The contempt proceedings commenced in late 2009 but were continued when Nick notified the court of an automatic stay following his March 1, 2010 filing of a petition for relief from creditors under Chapter 13 of the Bankruptcy Code. On July 23, 2010, the bankruptcy court granted Melissa relief from the stay, allowing her to proceed in the family court action. She filed notice of the termination of stay in family court on or about October 7, 2010.

and placed him on three years' probation on the condition he use good faith to assure these funds were available to Melissa.

*The Decision on the Motions at Issue in This Appeal*

At the hearings on the parties' modification motions, the court was asked to decide Nick's child support obligation from November 21, 2008, through mid-June 2010 (the support period), as well as his entitlement to modification of spousal support through July 31, 2010.[4]  After the hearings began, Melissa filed a motion for attorney fees ($33,359) and costs ($2,906).

The parties submitted their direct testimony by written declaration, which was subject to cross-examination at the hearings on October 17, 2011, and March 5 and 6, 2012.  Gilpin also testified.  Before the court were Nick's individual tax returns for 2007, 2008, and 2009; his business tax returns for 2008 and 2009; the bank statements for his personal and business checking accounts from March 2009 through August 2009; his March 1, 2010 bankruptcy petition; the parties' income and expense declarations; and other financial documents.

The following income evidence was presented below:

2007

On a June 2007 residential loan application, Nick reported monthly income of $20,000 in salaries plus $3,500 in bonuses.[5]  He testified this loan application includes income from stock he sold to purchase a house.[6]  His 2007 tax return indicates the sales price for stock he sold on May 31, 2007, was $49,168.  This tax return shows income of $274,371, including wages/salaries of $246,940; a tax refund of $332; and capital gains of $27,099.

---

[4]   A support order may only be modified prospectively, except a modification may be made retroactive to the date of service of the motion to modify.  (*County of Santa Clara v. Perry* (1998) 18 Cal.4th 435, 441.)

[5]   Melissa received additional child support in 2007 based on bonuses Nick received under a wage assignment.

[6]   Nick testified his stock options had been divided between the parties.

Nick's employer notified him on February 4, 2008, he was being laid off from his human resources job and would be terminated effective April 4, 2008. He received his regular paycheck through April 4 and a severance package, consisting of his accrued vacation, cashed out stock from the stock purchase plan, and amounts in consideration for releasing the company from liability. In April 2008, he started a human resources consulting firm, contracting with employers to assist them with human resources issues, including hiring and health care coverage. His tax returns for 2008 show total income of $240,624, including wages/salaries of $124,428; pensions/annuities of $14,974; ordinary dividends of $83, and business income of $101,139.[7] Nick testified the wages/salaries stated on his 2008 tax returns reflect his wages from FormFactor and the severance package.

Nick testified that his business "tanked" at the end of 2008. He said employers were no longer hiring after the market crashed in October 2008, and no longer needed his services. The expense data he attached to his March 2009 income and expense declaration show gross business receipts as follows from May 2008 through January 2009: May 2008, $16,100; June 2008, $11,200; July 2008, $18,400; August 2008, $19,600; September 2008, $9,600; October 2008, $20,000; November 2008, $17,600; December 2008, $12,800; and January 2009, $10,400.

Nick stated, and Melissa acknowledged below, that the pension income on his tax returns reflects a 2007 loan from his 401(k) to purchase his house, which was treated as income in 2008 because he could not repay it.

2009

In his March 2009 income and expense declaration, Nick estimated his average monthly income was $8,781. In his June 2009 income and expense declaration, he estimated his average monthly income was $5,042. Both declarations also list as monthly

---

**7** Nick's 2008 business tax returns show $101,139 in ordinary business income, based on gross receipts of $139,200.

income a $3,000 loss from rental property. In the attached business income statement, Nick reported average gross monthly income of $9,600 with average net monthly income of $4,982 for the period January through March 2009.[8]

Nick's 2009 tax returns show income of $30,200, including $25,592 from rental real estate and his business, $4,522 in capital gains, and $86 in ordinary dividends. This reflects ordinary business income of $50,592, offset by a $25,000 rental real estate loss.[9] Nick maintained the capital gains he reported as income resulted from the sale of stock in his son's name.

## 2010

In Schedule I of his bankruptcy petition ("Current Income of Individual Debtors"), Nick reported $8,000 as his "[r]egular income from operation of business . . . ." He testified this amount reflected his most recent income, but later noted the language on the bankruptcy form indicating it was an estimate of his average or projected monthly income when he filed his petition. On March 15, 2010, he reported to the bankruptcy court that his 2010 year-to-date gross business income was $15,000.

The second mortgage on his house ($161,000) was discharged in bankruptcy, but his monthly bankruptcy payment was approximately the same amount, and he said this debt forgiveness was offset by a reduction in his home's value.

---

[8]  A printout purporting to set forth invoice and payment amounts for an entity called Eye-Fi, Inc., shows the following payments in 2009: February 2009, $9,600; March 2009, $4,800; April 2009, $9,600; May 2009, $9,600; June 2009, $9,600; July 2009, $4,800; August 2009, $14,400; and September 2009, $9,600. Melissa obtained this information by subpoena and offered it as an exhibit in the contempt proceedings. The trial court said there would be "a stand-alone record" in the modification proceedings but allowed the parties to refer to the exhibits from the earlier proceedings. Nothing in the record provided identifies Eye Fi, Inc., or explains this exhibit.

[9]  Nick said his financial problems in 2009 forced him to move in with his girlfriend and rent out his house. He listed the house three weeks before Melissa's motion and began renting it on January 1, 2009, for $3,000 a month—$2,000 less than his mortgage payments and property taxes. The loss stated on his tax returns is based on $32,853 expenses and $30,275 depreciation.

7

In a March 2012 income and expense declaration, Nick reported $10,000 average monthly income.

Melissa sought an increase in Nick's monthly child support obligation from $1,438 to $2,215 during the support period, based on a gross monthly income of $20,578 for Nick, as reported on his 2007 tax returns. She contended Nick had provided inconsistent and incomplete financial documents.

Nick asked the court to reduce his child support obligation: (1) from November 21, 2008 to December 31, 2008, based on monthly gross income of $12,642 (his self-employment income since April 2008, as reported on his 2008 tax return); (2) from January 1, 2009, to December 31, 2009, based on monthly gross income of $4,485, which included his net business income from his 2009 tax returns ($50,592), his annual dividend income ($86), and his annual rental income minus repairs ($3,147); and (3) from January 1, 2010, to June 2010, based on monthly income of $8,000, the average projected self-employment income reported in his March 2010 bankruptcy petition. In addition to Melissa's employment income, Nick urged the court to consider the financial support Gilpin had given her since July 2007.

Melissa maintained amounts she received from Gilpin were loans documented by promissory notes, which she intended to repay to a trust account Gilpin had set up for his children from another marriage.[10]

On April 11, 2012, the court granted Melissa's motion to modify child support and increased Nick's monthly child support obligation during the support period to $2,414. The court attached a DissoMaster calculation based on gross monthly income of $20,052 for Nick and $2,496 for Melissa, noting it had obtained "the inputs" for Nick from his 2008 federal income tax return and those for Melissa from her income and expense

---

[10] Melissa's May 2011 and March 2012 income and expense declarations show she owed the David Gilpin Trust over $175,000.

declaration.[11]  The court denied Nick's motion to modify support, concluding he had presented insufficient credible evidence upon which to base a modification of support.

The court stated it found Melissa's testimony credible but Nick's testimony was "often nonresponsive, inconsistent, argumentative, and at some junctures simply not credible."  To the extent there were conflicts in the parties' testimony, the court resolved them in Melissa's favor.

The court awarded Melissa $33,359.25 in attorney fees and $7,446.32 in costs under Family Code section 2030 (disparity between the parties in access to legal representation and the ability of one party to pay for legal representation for both).  As an alternative basis for the attorney fee award, the court relied on Family Code section 271, finding Nick "has continuously failed to present full, accurate, and timely financial information to [Melissa] and her counsel.  His failure to do so has resulted in [Melissa's] incurring substantial attorney's fees that were necessitated only by his evasions and misinformation.  [His] conduct in this case is as egregious as this court has seen[.]  His conduct is epitomized, though not exhausted, by his casual response to a question during the hearings on these motions that[,] of the contradictory pleadings he signed under penalty of perjury to this court, the bankruptcy court, and the IRS, he thought the tax forms (which, not surprisingly, were most favorable to him) were the most accurate."  (See Fam. Code, § 271 [authorizing attorney fees based "on the extent to which the conduct of each party or attorney furthers or frustrates the policy of the law to promote settlement of litigation and, where possible, to reduce the cost of litigation by encouraging cooperation between the parties and attorneys"].)

Nick filed a timely notice of appeal from the court's April 11, 2012 order.

---

[11]  Nick concedes that the court accepted Melissa's claim the funds Gilpin provided were loans and does not challenge this finding on appeal.  Additionally, although he notes that the trial court did not comply with his request for a statement of decision, he does not assert this as a ground for reversal.

DISCUSSION

I. *The Support Orders*[12]

Nick challenges the income figure relied on by the trial court in granting Melissa's motion for modification of child support and denying his own motion for modification of both child support and spousal support.

"We review a child support order for abuse of discretion. [Citation.] In so doing, we determine ' "whether the court's factual determinations are supported by substantial evidence and whether the court acted reasonably in exercising its discretion." [Citation.] We do not substitute our own judgment for that of the trial court, but determine only if any judge reasonably could have made such an order.' [Citation.] In exercising its discretion, however, the trial court must follow established legal principles. [Citation.] To decide whether the trial court followed established legal principles and correctly interpreted the child support statutes, we apply the independent standard of review. [Citation.]" (*In re Marriage of Alter* (2009) 171 Cal.App.4th 718, 730-731.) Whether modification of a spousal support order is warranted also rests in the sound discretion of the trial court. (*In re Marriage of Olson* (1993) 14 Cal.App.4th 1, 7.)

A party moving for modification of support "has the burden of showing a material change of circumstances since the last order was made. [Citation.]" (*In re Marriage of Tydlaska* (2003) 114 Cal.App.4th 572, 575 (*Tydlaska*).) This showing requires a comparison of the "financial information on which the original support order was based with the most recent financial information relevant to a new order." (*Id.* at pp. 575-576.) When a court modifies an existing child support order, it must determine the appropriate amount of support under the uniform child support guidelines. (Hogoboom & King, Cal. Practice Guide: Family Law (The Rutter Group 2012), ¶ 6:130, p. 6-57 (rev. #1, 2012).) " 'The key financial factor in the guideline formula is net disposable income' [citation]" (*In re Marriage of Hubner* (2001) 94 Cal.App.4th 175, 186), which is computed by

---

[12] The court's order is directly appealable to the extent it relates to the modification of support. (Code Civ. Proc., § 904.1, subd. (a)(2); *In re Marriage of Zimmerman* (2010) 183 Cal.App.4th 900, 906 [postjudgment orders regarding modification of support].)

10

determining the parties' gross annual income less allowable deductions and dividing by 12 (*In re Marriage of LaBass & Munsee* (1997) 56 Cal.App.4th 1331, 1336). "The formula is always predicated on knowing what both parents' income is in nominal static dollars at the time the order is made." (*In re Marriage of Hall* (2000) 81 Cal.App.4th 313, 317-318, fn. omitted.) Where income fluctuates from month to month, the court "must arrive at a stable number in order to make a support order." (*In re Marriage of Riddle* (2005) 125 Cal.App.4th 1075, 1081 (*Riddle*).)[13]

The trial court found Nick's gross monthly income was $20,052, one-twelfth of the annual income shown on his 2008 tax returns. Its DissoMaster calculation is based on the following income breakdown, derived from Nick's 2008 tax returns: (1) wages/salaries of $10,369 a month; (2) self-employment income of $8,428 a month; and (3) other taxable income of $1,255 a month, consisting of pension/annuities income of $1,248 a month (the 401(k) loan) and ordinary dividends of $7 a month. Nick contends the trial court erred in basing its support order on wage and pension income he no longer had after mid-2008, namely, wages from a job that terminated on April 4, 2008, a one-time severance package, and a loan from his 401(k) in 2007. In short, he contends substantial evidence does not support the trial court's income determination.

"The assumption underlying [support] calculations is that past income is a good measure of the future income from which the parent must pay support." (*County of Placer v. Andrade* (1997) 55 Cal.App.4th 1393, 1396; accord, *Riddle*, *supra*, 125

---

[13]  As this discussion suggests, an order modifying support must be based on current facts and circumstances existing at the time the order is made. (*Tydlaska*, *supra*, 114 Cal.App.4th at pp. 575-576.) In the unique circumstances of this case, the trial court decided Melissa's motion for modification more than three years after it was made and almost two years after Nick's child support obligation ended in June 2010. The record indicates that neither the parties nor the trial court relied on income in 2012, when the matter was decided. Nick does not contend the trial court erred in failing to determine his "current" income as of the date of the support hearing. The trial court based its income finding for Nick on his 2008 tax returns, and relied on Melissa's December 4, 2008 income and expense declaration, instead of her May 2011 and March 2012 declarations. In its September 2011 order, the court questioned whether the parties were even required to file current income and expense declarations.

11

Cal.App.4th at pp. 1081-1082.) The court's determination of a stable income number provides "a reasonable predictor of what each spouse or parent will earn in the immediate future. [Citation.] The theory is that the court is trying to predict likely income for the immediate future, as distinct from extraordinarily high or low income in the past." (*Riddle*, at pp. 1081-1082, italics omitted [concluding the trial court abused its discretion in "tak[ing] so small a sliver of time to figure income that the determination essentially becomes arbitrary"]; see *id* at p. 1083.) The trial court in this case was asked to modify Nick's support obligation for an 18-month period in the past, not to determine support prospectively; but the court effectively *predicted* his income from November 21, 2008 to June 2010 using his income in 2008. Nick acknowledges "the previous year['s income] is often a good indicator of future income," but maintains "that is not true when someone has been terminated, especially during a recession as deep as the one out of which we are slowly emerging. Since Nick's severance pay was a one-time event . . . , it cannot have been part of his prospective earnings on which support was going to be paid." For the same reason, he argues it was error to rely on pension income reported in his 2008 tax return. We agree.

It is undisputed that Nick lost his job at FormFactor in February 2008; that, as a result of this event, he received a severance package, consisting of at least two months of wages, his accrued vacation and cashed-out stock, and consideration for releasing the company; and that the wages/salaries income on which the trial court relied reflects his wages and the severance package from FormFactor. Melissa also concedes the pension income reported on his 2008 tax returns represents a loan from his 401(k) in 2007 that was assigned to him as income in 2008 because he did not repay it. These uncontroverted facts demonstrate that there is no basis for concluding that Nick would continue to receive the wages/salaries income from his 2008 tax returns: his regular wages from FormFactor had ceased as of April 4, 2008, and his severance package and pension income were one-time events unlikely to recur. As this income was nonrecurring and bears no rational relationship to Nick's income during the support period, it has no predictive value in determining his income during that period and does not constitute

12

substantial evidence supporting the trial court's income determination. Indeed, to the extent the trial court relied on the wages/salaries and pension income reported on Nick's 2008 tax returns ($11,617 a month), its income determination is arbitrary.

Melissa does not point to *any* substantial evidence showing Nick had income of $20,052 a month during the support period.[14] She argues that Nick's 2008 tax returns were "the last best evidence the trial court had on which to rely," "given the paucity of credible evidence introduced by Nick" and "the lack of reliance it could place on Nick's documents and testimony." She fails to note, however, that it was her burden, not Nick's, to provide evidence his financial situation had changed, justifying an increase in support. (*Tydlaska*, *supra*, 114 Cal.App.4th at p. 575.) And while the trial court was entitled to reject the evidence of Nick's income on credibility grounds, the credibility finding does not constitute substantial evidence of any particular income figure to utilize in the support calculation. "The rejection of a witness's testimony by the trier of fact has only the effect of removing that testimony from the evidentiary mix. Without more, the disregard or disbelief of the testimony of a witness is not affirmative evidence of a contrary conclusion. [Citations.] In other words, the fact that the trier of fact does not credit a witness's testimony does not entitle it to adopt an opposite version of the facts which otherwise lacks evidentiary support." (*Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1205.) Melissa also fails to provide any authority allowing a trial court to arbitrarily determine income based on past income with no predictive value, even if it disbelieves all other evidence of income during the support

_____

[14] There is no evidence in the record that Nick received additional wages, severance, or pension income during the support period. Melissa asserts that Nick had $225,000 in forgiveness-of-debt income following his discharge in bankruptcy. But the record does not show Nick was discharged in bankruptcy during the support period; also, Melissa provides no authority showing the tax laws treat a discharge in bankruptcy as forgiveness-of-debt income. (See *Riddle*, *supra*, 125 Cal.App.4th at p. 1080 ["[I]f the tax laws say you have income because of the forgiveness-of-debt, you have income, and that forgiveness-of-debt income must go into the calculation of adjusted gross income . . ."].)

13

period; and she provides no authority requiring us, in such circumstances, to affirm an income determination that is not supported by substantial evidence.[15]

As the trial court's order granting Melissa's motion to modify child support is predicated upon an arbitrary income determination that is not supported by substantial evidence, it must be reversed.[16]

No similar basis exists for reversing the trial court's order as it relates to Nick's motion. The trial court found Nick had "presented insufficient credible evidence in these proceedings upon which the court might base a decision to modify support," effectively concluding he had not met his burden to show changed circumstances entitling him to a

---

[15] Our own research has identified two decisions that address the consequence of a party's failure to provide accurate and complete income information. *In re Marriage of Calcaterra & Badakhsh* (2005) 132 Cal.App.4th 28 (*Calcaterra*) upheld a child support award, stating, "Neither the trial court, nor this court, know the true state of father's financial affairs. That is his fault. Family law court is a court of equity. [Citation.] Those who seek equity, must do equity and have 'clean hands.' [Citation.] [The father, who was found to have committed perjury, was] in no position to complain that the trial court drew adverse inferences in modifying child support." (*Id.* at p. 38.) The *Calcaterra* court cited *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104 (*Chakko*), noting "the courts will not tolerate those who interfere with the truth-seeking function of the trial court." (*Calcaterra*, at p. 31; see *Chakko*, at p. 110 ["Those who interfere with the truth-seeking function of the trial court strike at the very heart of the justice system. The courts will not tolerate such interference"].) These decisions are distinguishable, as there was substantial evidence in each of these cases to support the trial court's income determination. (*Calcaterra*, at pp. 35-36, 38; *Chakko*, at pp. 108-110.) Moreover, at issue in *Chakko* was a discovery issue sanction the trial court had imposed for the father's failure to comply with an order compelling him to provide discovery of his financial records to his ex-wife. (*Chakko*, at p. 106 [declaring his income was $40,000 per month and precluding him from offering any evidence to the contrary].) Melissa's brief directs us to no discovery orders violated by Nick, there is no indication in the record that she sought a sanction for any such failure to obey a court order, and she conceded at oral argument that she could not identify any instance in which the trial court imposed one.

[16] Our conclusion that there is no substantial evidence to support the trial court's income determination as to Melissa's motion does not necessarily indicate that she failed to meet her burden to demonstrate a change in circumstances justifying an increase in support. On remand, the trial court must reconsider this issue, using an income determination for Nick that is consistent with this opinion.

14

reduction in support. (See *Tydlaska*, *supra*, 114 Cal.App.4th at p. 575.) We do not revisit the trial court's credibility findings. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1319; *Loeffler v. Medina* (2009) 174 Cal.App.4th 1495, 1502, fn. 6.) Such deference is particularly appropriate where, as here, oral testimony was given in the presence of the trier of fact "because such testimony affords the trier of fact an opportunity to observe the demeanor of witnesses." (*Elkins v. Superior Court* (2007) 41 Cal.4th 1337, 1358 ["A witness's demeanor is ' "part of the evidence" ' and is 'of considerable legal consequence.' [Citations.]"].)[17] Having found that Nick was not credible, the trial court could properly reject, in whole or in part, documentary evidence based on information he provided. (*Calcaterra*, *supra*, 132 Cal.App.4th at pp. 31, 36 [" '[A] trier of fact may believe and accept as true only part of a witness's testimony and disregard the rest. [Citations.]' " The same rule applies where "a document is prepared by the witness or at his direction."].) As Nick has not demonstrated he met his burden to show changed circumstances entitling him to a reduction in support, the trial court's order must stand as it relates to his motion.

We therefore conclude reversal of the trial court's order is warranted as it relates to Melissa's motion but not as it relates to Nick's motion.[18]

---

[17] We also observe that these hearings were held in the context of an earlier contempt proceeding in which the trial court found that Nick had failed to pay support as ordered notwithstanding his ability to do so; and, although Nick has discredited many of the inconsistencies Melissa identified in his financial documents, several remain valid.

[18] In so holding, we reject Nick's remaining arguments. Contrary to his assertion, the statutes did not require the trial court to appoint a special master (Code Civ. Proc., § 639) or referee (Evid. Code, § 730) simply because it did not believe his evidence. Nick also presents no authority demonstrating the trial court was required to use separate calculations that tracked his fluctuating income during the support period instead of using a single income determination for the entire period.

II. *The Attorney Fee Award*[19]

Nick contends the trial court abused its discretion in awarding attorney fees and costs to Melissa because its finding he had or was reasonably likely to have the ability to pay for legal representation for both parties was based in part on his 2008 income. The record does not clearly identify whether, in concluding Melissa was entitled to attorney fees under Family Code section 2030, the trial court relied on the arbitrary income determination it used for Nick in calculating child support, or whether it relied on the income stated in Nick's March 2012 income and expense declaration. Nick has not demonstrated that the alleged error was prejudicial, in any case, as he challenges only the trial court's attorney fee award under Family Code section 2030 and does not address the propriety of the trial court's alternative award of attorney fees under Family Code section 271. For the same reason, he fails in his contention that "the entire spectrum of attorney's fees and costs should be reexamined by the trial court" if the case is remanded for further proceedings. In *In re Marriage of Partridge* (1990) 226 Cal.App.3d 120, 129 (*Partridge*), the court reversed an attorney fee award under a former code section substantially similar to Family Code section 271, stating its finding that the husband's position on one of the issues was warranted "may have undermined the basis for the award of fees (the trial court not having specified the basis for its award)." (*Partridge*, at p. 129 [addressing former Civ. Code, § 4370.5 (Stats. 1989, ch. 1105, § 3, p. 3969)].) Even assuming our holding regarding the trial court's income determination for Nick may impact the analysis of the attorney fee issue under Family Code section 2030, Nick does not provide authority and reasoned analysis demonstrating that our holding in this regard

---

[19] The attorney fee award is directly appealable. (*In re Marriage of Weiss* (1996) 42 Cal.App.4th 106, 119 [a pendente lite attorney fee order where nothing remains for judicial determination except the issue of compliance or noncompliance with its terms]; *In re Marriage of Guilardi* (2011) 200 Cal.App.4th 770, 773 [Fam. Code, § 2030 "authorizes an award of pendente lite attorney fees"]; *In re Marriage of Burgard* (1999) 72 Cal.App.4th 74, 82 [an order awarding attorney fees as a sanction under Fam. Code, § 271]; Code Civ. Proc., § 904.1, subd. (a)(11) & (12) [sanctions award above $5,000].)

16

has any bearing on Melissa's entitlement to attorney fees under Family Code section 271.[20]

DISPOSITION

The trial court's order is reversed as it relates to Melissa's motion for modification of child support, but is otherwise affirmed. The matter is remanded to the trial court with directions to make a new order regarding this motion based on an income determination for Nick that is consistent with the principles set forth in this opinion. The parties shall bear their own costs on appeal.

_____

SIMONS, J.

We concur.

_____

JONES, P.J.

_____

NEEDHAM, J.

---

[20] *In re Marriage of Koppelman* (1984) 159 Cal.App.3d 627 (*Koppelman*) is inapposite, as it does not state the basis for the attorney fees at issue in that case, and it appears the parties sought an award as the prevailing party, not under Family Code sections 2030 or 271. (See *Koppelman*, at p. 636, disapproved on another ground in *In re Marriage of Fabian* (1986) 41 Cal.3d 440, 451, fn. 13.)